Argued and submitted June 14, reversed and remanded for reconsideration
December 13, 2006

# ASSOCIATION OF OREGON
# CORRECTIONS EMPLOYEES,
*Respondent,*

*v.*

# STATE OF OREGON,
# DEPARTMENT OF CORRECTIONS,
*Petitioner.*

## UP-3303; A128917

149 P3d 319

Erin C. Lagesen, Assistant Attorney General, argued the cause for petitioner. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Becky Gallagher argued the cause for respondent. With her on the brief was Garrettson, Goldberg, Fenrich & Makler, P.C.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Richardson, Senior Judge.

RICHARDSON, S. J.

## RICHARDSON, S. J.

Petitioner Department of Corrections (DOC) seeks judicial review of an order of the Employment Relations Board (ERB), contending that ERB erred in holding that DOC committed an unfair labor practice as defined in ORS 243.672(1)(e) when it failed to bargain over proposed changes to the bid schedule for employee shifts and days off. ERB ordered DOC to cease and desist from refusing to bargain over such changes. DOC contends that, under the terms of the collective bargaining agreement (CBA) with DOC employees, it had the right to "schedule work" without engaging in additional bargaining with the exclusive bargaining representative, Association of Oregon Corrections Employees (AOCE). We review for errors of law and substantial evidence, ORS 183.482(8), and reverse and remand.

The facts are undisputed and come from ERB's order. AOCE is the exclusive representative for a bargaining unit of correctional officers, sergeants, and corporals employed by DOC at the Oregon State Penitentiary (OSP). AOCE and DOC were parties to a CBA effective July 1, 2001 through June 30, 2003. Several CBA articles pertain to the issues in dispute in this case. Article 3 of the CBA—Management Rights—provides, in part:

> "The Employer retains all rights to direct the work of its employees, including, but not limited to, the right to hire, promote, assign, transfer, demote, suspend, or discharge employees for proper cause; *to schedule work*; determine the processes for accomplishing work; to relieve employees from duties because of lack of work or for other legitimate reasons; to take action as necessary to carry out the missions of the State; or determine the methods, means, and personnel by which operations are to be carried on, except as modified or circumscribed by the terms of this Agreement."

(Emphasis added.) Article 28, Section 1, Work Week, provides:

> "The work week shall begin at 12:01 a.m. Sunday and end at 12:00 midnight the following Saturday. All permanent full-time employees in the unit shall be scheduled for five (5) shifts of eight (8) hours with two (2) consecutive

days off within each work week or four (4) shifts of ten (10) hours with three (3) consecutive days off within each work week, or a twelve (12)-hour work day with a schedule in which the employee works three (3) twelve (12)-hour days followed by four (4) days off and then four (4) twelve (12)-hour days followed by three (3) days off. * * *

"If a variance from this paragraph is required in order to accomplish the mission of the Institution, *the Employer shall notify the Association of the reasons for the change prior to the effective date,* and the Association shall be afforded an opportunity to comment and offer alternative suggestions. If the *Association feels that the change is unreasonable, the matter may be processed as a grievance."*

(Emphasis added.) Section 2, Working Hours, provides, in part:

"The standard work day shall be a period of twenty-four (24) hours containing eight (8) or ten (10) consecutive hours of work interrupted by rest and meal periods."

Section 3, Work Schedule, provides:

"Schedules showing each employee's shift, work days, and hours shall be posted in the appropriate work unit at all times. Except for emergency situations, external contract work, fire crew response or as mutually agreed, the *Employer will provide seven (7) days notice of changes in work schedules."*

(Emphasis added.) Section 7, Shift and Time Off Bidding, provides, in part:

"A.   Regular status employees in the Correctional Officer series may bid for shifts and days off on a schedule posted by the Employer at their institution on the basis of their classification seniority as defined in Article 39. Regular status employees in the Correctional Officer series assigned to positions in Special Housing at OSP (DSU, SMU, and IMU) * * * may bid within those work units or shifts and days off on a schedule posted by the Employer at the work unit on the basis of their classification seniority as defined in Article 39. The manner of bidding will be consistent with the method spelled out in paragraph E of this Section.

"B.   Shift and time off schedule bidding shall apply to all bargaining unit work sections, except Education Services. * * *

"* * * * *

"E.   All affected employees, after placing two (2) successful and consecutive bids on the same shift/days off and working on such shift/days off for two (2) consecutive six (6) month periods, may remain on such shift/days off without placing any further bids unless out bid by a senior employee. Such employee will, however, be eligible to place bids on other shift/days off as the rotation dates occur.[1]

"* * * * *

"H.   Employees will bid for a six (6) to twelve (12) month cycle to commence on or about August and February of each year. The Employer shall post notice of proposed six (6) to twelve (12) month rotation of shift and time off schedules and a seniority roster at the work unit thirty (30) days in advance of the bid."

Article 2, Section 2, of the CBA provides that it is to remain in full force and effect during the negotiation process.

Before 2000, security staff at OSP bid monthly for their shift schedules. In 2000, as a result of an interest arbitration award, security staff began bidding twice a year. Paula Allen, who was the manager of the security staff until July 2002, worked with AOCE to implement the twice-a-year bid schedule. In the meantime, the legislature imposed new staffing standards, which resulted in OSP gaining seven new sergeant positions and losing eight officer positions. Allen and AOCE worked together to revise the shift schedule to accommodate the new staffing standards and the new sergeant positions. The parties worked cooperatively and reached an agreement on a modified schedule that would be effective as of July-August 2002. ERB found that AOCE did not demand to bargain the changes. The new schedule was posted for 17 days. DOC then received notice that the anticipated sergeant reclassification had not been completed, so the revised schedule was removed and the previous schedule

---

[1] ERB noted that this section of the CBA is referred to as the "incumbency" provision.

was reposted. In July 2002, Thomas Wright succeeded Allen as OSP's security staff manager and, in September 2002, Gerald Long became OSP's assistant superintendent of security.

In January 2003, the parties began negotiations on a successor CBA. At the first bargaining session, AOCE proposed to amend Article 28 to provide for "post bidding." DOC did not respond to the proposal. In May 2003, AOCE became aware that DOC intended to post a new schedule at OSP, beginning with the July-August 2003 shift bid schedule, which changed the rank of various assignments and the start/stop times and days off for a large number of security personnel. The result of those changes was to eliminate the incumbency provision of the CBA. During a bargaining session on May 27, 2003, AOCE counsel Daryl Garrettson informed DOC that the schedule changes affected mandatory subjects of bargaining and that DOC would be committing an unfair labor practice if it implemented the new schedule without first bargaining. ERB found that the parties then agreed to address the schedule issues outside of the formal contract negotiation process.

On May 29, 2003, Long informed all security staff that, due to the implementation of staffing standards and additional sergeant positions, it would be necessary for all staff to bid, including those staff who held incumbencies. On May 30, 2003, AOCE and DOC met to discuss the schedule and did not reach an agreement. Later that same day, DOC posted the new schedule.

The new schedule was similar to the schedule that had been temporarily posted in July-August 2002, but includes additional changes to the shift and start/stop times, days off, and assignments. It also required all incumbents to bid.

Also on May 30, 2003, AOCE President Gary Harkins posted a memo to staff stating:

"This is to inform all staff that the AOCE does not agree with or support the wholesale changes to the Bid Schedule. There are over 130 changes to this schedule which equate to 60% of the schedule. Some of these changes should have

been negotiated at the Bargaining table but were not. The AOCE will pursue the avenues it has available to us."

On June 27, 2003, AOCE filed this unfair labor practice complaint, charging that DOC had violated ORS 243.672(1)(e)[2] by unilaterally altering four separate working conditions: (1) the ranks that employees must hold in order to bid on certain assignments; (2) the start/stop times for shifts; (3) days off; and (4) the incumbency provision of the CBA. AOCE also charged that DOC violated ORS 243.672(1)(a)[3] by unilaterally implementing the schedule changes and thereby interfering with the members' right to bargain collectively on the issue. ERB held, with one member dissenting, that DOC violated ORS 243.672(1)(e) by refusing to bargain over the schedule changes involving days off and start/stop times for shifts. ERB rejected DOC's affirmative defense that AOCE had waived its right to bargain by express contract language and by its prior actions, finding that DOC had failed to produce "clear and unmistakable" evidence of waiver. ERB dismissed AOCE's remaining allegations under ORS 243.672(1)(e) and also concluded that the DOC's conduct in refusing to bargain over schedule changes was not a violation of ORS 243.672(1)(a).

■    DOC seeks judicial review of ERB's order, contending that ERB erred in concluding that DOC committed an unfair labor practice under ORS 243.672(1)(e) in refusing to bargain over the schedule changes involving days off and start/stop times for shifts. Specifically, DOC asserts (1) that under the CBA, which gave DOC the right to "schedule work," DOC was authorized to make the shift changes; and (2) that by operation of ORS 243.698,[4] AOCE waived any

---

[2] ORS 243.672(1)(e) provides that it is an unfair labor practice to "[r]efuse to bargain collectively in good faith with the exclusive representative."

[3] ORS 243.672(1)(a) provides that it is an unfair labor practice to "[i]nterfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662." ORS 243.662 provides, in turn that:

"Public employees have the right to form, join and participate in the activities of labor organizations of their own choosing for the purpose of representation and collective bargaining with their public employer on matters concerning employment relations."

[4] ORS 243.698 provides, in part:

"(1)  When the employer is obligated to bargain over employment relations during the term of a collective bargaining agreement and the exclusive

right to bargain the schedule changes by failing to file a timely demand to bargain. DOC also contends that ERB erred in applying a "clear and unmistakable" standard to DOC's affirmative defense of waiver. The questions on review raise purely legal issues, which we review for errors of law. *OSEA v. Rainier School Dist. No. 13*, 311 Or 188, 193-95, 808 P2d 83 (1991).

■        We first address DOC's contention that DOC did not have a duty to bargain over the proposed schedule changes because the terms of the CBA authorized DOC to change employee work schedules unilaterally. In particular, DOC contends that Article 3, the "Management Rights" provision, expressly grants to DOC the authority to unilaterally change employee work schedules. Article 3 gives DOC

> "all rights to direct the work of its employees, including, but not limited to, the right to hire, promote, assign, transfer, demote, suspend, or discharge employees for proper cause; to schedule work."

DOC also contends that Article 28, which contains specific limitations on DOC's right to schedule work, indicates that, other than with respect to the limitations listed, the parties intend for DOC to have the authority to establish schedules.

        ERB did not attempt to construe the CBA to determine whether it authorized DOC to make unilateral schedule changes, because it concluded that the scheduling of an employee's particular days and hours of work is a *per se* mandatory subject of bargaining under ORS 243.650(7)(a)[5] and ERB precedent, *Eugene Police Employees' Assoc. v. City of*

---

representative demands to bargain, the bargaining may not, without the consent of both parties and provided the parties have negotiated in good faith, continue past 90 calendar days after the date the notification specified in subsection (2) of this section is received.

        "(2) The employer shall notify the exclusive representative in writing of anticipated changes that impose a duty to bargain.

        "(3) Within 14 calendar days after the employer's notification of anticipated changes specified in subsection (2) of this section is sent, the exclusive representative may file a demand to bargain. If a demand to bargain is not filed within 14 days of the notice, the exclusive representative waives its right to bargain over the change or the impact of the change identified in the notice."

        [5] ORS 243.650(7)(a) provides: " 'Employment relations' includes, but is not limited to, matters concerning direct or indirect monetary benefits, hours, vacations, sick leave, grievance procedures and other conditions of employment."

*Eugene,* 17 PECBR 299 (1997), *aff'd,* 157 Or App 341, 353, 972 P2d 1191 (1998), *rev den,* 328 Or 418 (1999). ERB did, however, consider whether the CBA showed an intention by AOCE to waive the right to bargain. Citing its own precedent, *OSEA v. Bandon School District #54,* 19 PECBR 609 (2002), ERB explained that a party may waive its right to bargain through "clear and unmistakable" contract language. In the context of that analysis, ERB discussed Articles 3 and 28 of the CBA and concluded that they were ambiguous as to whether DOC had the right to unilaterally change start/stop times and days off for employees and, accordingly, that such ambiguity precluded a finding of a "clear and unmistakable" waiver of bargaining over those subjects.

■    DOC acknowledges that ORS 243.650(7) provides that "hours" of work is a matter concerning "employment relations" subject to bargaining. DOC asserts that the current bargaining agreement reflects and memorializes the parties' bargaining on that matter and permits unilateral decision-making by DOC. We agree with DOC that, if the CBA authorizes an employer to act unilaterally with respect to certain conditions of employment, then changing those conditions is not a change in the status quo, and a failure to bargain before changing them cannot be an unfair labor practice. *See Marion Cty. Law Enforcement Assn. v. Marion Cty.,* 130 Or App 569, 883 P2d 222 (1994), *rev den,* 320 Or 567 (1995) (CBA unambiguously authorized the employer to unilaterally change employees' work schedule); *Enlow Medical Center v. NLRB,* 433 F3d 834 (DC Cir 2005) (refusal to bargain over changes allowed by the collective bargaining agreement not a basis for an unfair labor practice claim over refusal to bargain). If the CBA, which is the memorialization of the parties' bargaining, authorizes DOC to change employee work schedules, then a unilateral change in the work schedules is not a change in the status quo regarding a mandatory subject of bargaining and does not constitute an unfair labor practice.

■    Although ERB held, in the context of its waiver analysis, that the CBA "does not expressly give DOC the right to unilaterally change the start/stop times and days of employees," and that there was no "clear and unmistakable"

waiver of the right to bargain under the CBA, ERB did not construe the CBA for the purpose of determining whether it provides for unilateral schedule changes by DOC. Whether the CBA authorizes DOC to make unilateral changes in employee work schedules is a question for ERB to address in the first instance. As we said in *Marion Cty. Law Enforcement Assn.*, the meaning of the CBA is determined under general rules of contract construction. 130 Or App at 575. ERB must determine whether, under the terms of the CBA, DOC was authorized to make the changes in the work schedule that it did. If the CBA is ambiguous, then ERB is required to resolve the ambiguity by examining extrinsic evidence of the contracting parties' intent, if such evidence is available. *Arlington Ed. Assn. v. Arlington Sch. Dist. No. 3*, 196 Or App 586, 103 P2d 1138 (2004). In light of our holding that on remand ERB must interpret the provisions of the CBA to determine whether it authorized DOC to change work schedule start/stop times and days off unilaterally, we do not address DOC's contention that ERB erred in concluding that AOCE did not waive its right to bargain on those conditions of employment.

Reversed and remanded for reconsideration.