Argued and submitted December 16, 2010, reversed and remanded for reconsideration August 31, 2011

PORTLAND FIRE FIGHTERS' ASSOCIATION,
LOCAL 43, IAFF,
*Respondent,*

*v.*

CITY OF PORTLAND,
*Petitioner.*

Employment Relations Board
UP1407; A142845

263 P3d 1040

Harry Auerbach, Chief Deputy City Attorney, argued the cause for petitioner. On the opening brief was Stephanie Harper, Deputy City Attorney. With him on the reply brief was Stephanie Harper, Deputy City Attorney.

Barbara J. Diamond argued the cause for respondent. With her on the brief was Diamond Law.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Landau, Judge pro tempore.

SERCOMBE, J.

**SERCOMBE, J.**

Petitioner City of Portland (city) seeks judicial review of an order of the Employment Relations Board (ERB) that held that the city committed unfair labor practices under ORS 243.672(1)(e) and (f) by refusing to bargain with the Portland Fire Fighters' Association, Local 43, IAFF (association) about the impacts of a return-to-work program for permanently disabled fire fighters and by refusing to comply with the notification and bargaining procedures of ORS 243.698.[1] The city seeks reversal of ERB's rulings or remand to the agency for reconsideration. On review for errors of law, ORS 183.482(8)(a),[2] we reverse and remand for reconsideration.

The following facts are undisputed by the parties and come from ERB's order and the underlying record. The association is the exclusive bargaining representative for all sworn personnel in Portland Fire and Rescue (Fire Bureau). Chapter 5 of the city charter establishes the Fire and Police Disability, Retirement and Death Benefit Plan (Plan), which provides disability and retirement benefits for Fire Bureau employees, their surviving spouses, and dependent minor children. Chapter 5 also creates the Disability Fund, which administers the Plan; almost all of the sworn employees of

---

[1] ORS 243.672(1) provides, in part:

"It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"* * * * *

"(e) Refuse to bargain collectively in good faith with the exclusive representative.

"(f) Refuse or fail to comply with any provision of ORS 243.650 to 243.782."

ORS 243.698 details the notification and bargaining procedures that govern when a public employer anticipates changes in employment relations during the term of a collective bargaining agreement.

[2] ORS 183.482(8)(a) provides:

"The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, the court shall:

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law."

the Fire Bureau are covered by the Disability Fund. Pursuant to Chapter 5 and applicable administrative rules, association bargaining unit members who are unable to work because of an injury or illness may be eligible for benefits from the Disability Fund.

In 2001, the city council approved, and the Fire Chief implemented, a policy regarding temporary light-duty work assignments. The policy established five temporary light-duty positions that could be filled by Disability Fund members who were temporarily restricted from working in their regular jobs because of injury, illness, or pregnancy. That temporary light-duty policy continued until March 8, 2007, when it was replaced by a subsequent policy, which we discuss below. The association supported the creation of the temporary light-duty positions and never demanded to bargain about the decision to create the positions or the impacts of that decision.

Before 2002, Disability Fund members who were permanently restricted from working were placed on injury leave, rather than formally separated from employment. However, beginning in 2002, the city began medically separating from employment such permanently restricted Disability Fund members, if their restrictions were not covered by the Americans with Disabilities Act. Also in 2002, the trustees of the Disability Fund began to consider subsidizing the wages of Fire Bureau employees who had permanent restrictions if they returned to light-duty work at the Fire Bureau. Discussions regarding that long-term light-duty work assignment concept continued through 2006.

From July 1, 2005 to June 30, 2007, the city and the association were parties to a collective bargaining agreement (CBA). That CBA included a management rights clause, which reserved to the city

"the exclusive right * * * to reprimand, suspend, demote, discharge, or otherwise discipline employees for just cause except as modified in Article 26 of this agreement; hire, promote, transfer, lay off and recall employees to work; * * * expand, reduce, alter, combine, transfer, subcontract out;

assign or cease any job, operation or service[;] * * * determine * * * the assignment of work, and the size and composition of the work force; * * * and otherwise generally manage the City and direct the work force."

The management rights clause also provided that "[n]othing in this Agreement shall preclude the City Council from exercising its authority to classify, or reclassify positions and to establish entrance and promotional examination requirements."

　　　　In the spring of 2006, the Disability Fund analyzed five jobs that the Fire Bureau had indicated permanently restricted employees could fill: special operations assistant, low-hazard fire inspector, logistics assistant, driver instructor, and Emergency Medical Services (EMS) wellness/fitness assistant. Only the driver instructor position was included on the salary schedule of the 2005-07 CBA; however, it had not been filled since 2005. Under the CBA, the driver instructor position was classified as an inspector, entitled to 15 percent more pay than a fire fighter, if filled by an employee below the rank of Captain who worked 40 hours per week. In addition, the driver instructor was entitled to a six percent specialist pay differential. The other positions were new positions, although, in some cases, the duties assigned to the positions had been performed previously by fire fighters (low-hazard inspection duties) or several limited-term light-duty personnel (logistics assistant and EMS wellness/fitness assistant duties).

　　　　In the summer of 2006, the Fire Bureau notified the association that the city was considering creating a pilot return-to-work program for permanently restricted employees. In June 2006, the Disability Fund identified potential candidates for the program and sent a letter to those individuals about the anticipated restricted duty assignments. From July through December 2006, the Disability Fund contacted the disabled fire fighters' physicians, asking that the physicians determine if the disabled employees were medically able to perform the duties of the restricted assignment positions. From July through November 2006, Fire Marshal Klum discussed the return-to-work program with Association President Finders and Vice President Corah. The

Fire Bureau eventually assigned the rank of fire fighter to the low-hazard fire inspector position and agreed to place the remaining positions in the inspector classification with a six percent specialist pay differential. In October 2006, the Disability Fund and the Fire Bureau notified approximately 16 medically restricted fire fighters that they had been selected to participate in the program. A subsequent letter informed the selected individuals that training would begin on December 11, 2006.

Some of the recalled employees were unhappy. On December 11, the association sent a letter to the city demanding that the city

"bargain over any new bargaining unit positions that the City intends to create, as well as over the terms and conditions of employment for 'restricted duty' positions that are being created under the [return-to-work] program and any other mandatory subjects of bargaining that are included in or impacted by the new program."

The city declined the demand to bargain because it believed that the demand was premature and was related to a permissive subject of bargaining (assignment of work). Nonetheless, the association continued to ask the city to bargain about the return-to-work program. Although the city responded to questions posed by the association and engaged in informal discussions, the city continued to decline to bargain, maintaining that the CBA governed the terms and conditions of the returning workers' employment.

On March 7, 2007, the Fire Chief issued Memorandum 07-07, "Return to Work Policy—Pilot Program," which established a pilot program pertaining to temporary light-duty assignments and light-duty assignments for Disability Fund members with permanent restrictions. At the time the pilot program was implemented, the city charter provided that Disability Fund members who retired while still on disability for work-related illness or injury received lifetime reimbursement benefits for injury-related medical expenses. However, an employee who went on disability, returned to work, and then retired received reimbursement for work-related medical expenses only until retirement.

In response to implementation of the pilot program, in April 2007, the association filed an unfair labor practice complaint with ERB against the city. The association alleged that the pilot program addressed "numerous mandatory subjects of bargaining" that were not covered by the existing CBA, including but not limited to

"the wages for newly-created 'restricted duty' positions;

"the change in process for filling 'tested' positions without tests, and the availability of untested positions to non-disabled bargaining unit members;

"the creation of a 'recall' procedure for medically separated former employees;

"job security issues for [return-to-work] employees who are unable to satisfactorily perform the duties of positions in which they are placed because of their permanent disabilities;

"the loss of medical benefits after retirement that will result from the reemployment of permanently disabled [association] members; * * *

"leave availability and usage for [return-to-work] employees who are still receiving treatment for their disabilities;

"the elimination of EMT certification requirements; [and]

"workload issues."

The association claimed that the city had violated ORS 243.672(1)(e) when it refused to bargain about the decision, or the impacts of the decision, to create the return-to-work pilot program prior to the program's implementation. The association also claimed that the city violated ORS 243.672(1)(f) when it failed to comply with the requirements of ORS 243.698 to bargain about changes in employment relations during the life of a contract.

The city answered and generally denied having a duty to bargain because "there were no anticipated changes in any mandatory subject of bargaining." The city also asserted an "affirmative defense" that

"[a]ny alleged mandatory subjects of bargaining outlined in * * * the complaint are governed by the terms of a collective bargaining agreement between the parties. The City

asserts that some of the alleged items are permissive for bargaining and some of the alleged items are prohibited for bargaining. As for the items that would otherwise be mandatory subjects of bargaining, no change has occurred that triggers a duty to notify under ORS 243.698 or a duty to bargain under ORS 243.698 or ORS 243.672(1)(e)."

Further, the city asserted the separate "affirmative defense" that it "already had bargained to completion over any mandatory subjects and executed a collective bargaining agreement that reflects the complete and entire agreement of the parties as to all bargaining issues." The city requested that the complaint be dismissed and a declaration made that the city did not violate ORS 243.672(1)(e) or (f).

While the matter was pending, city voters passed Measure 26-93, which amended the city charter to provide that disabled Fire Bureau employees who return to work will receive lifetime reimbursement for medical expenses caused by a work-related injury or illness. The city asked ERB to take official notice of those election results and argued that the amendment to the city charter rendered "moot" that aspect of the association's complaint regarding the loss of post-retirement medical benefits for recalled employees.

Ultimately, ERB took official notice of the election results, but held that it had jurisdiction over the parties and the subject matter of the dispute. ERB concluded that the city did not violate ORS 243.672(1)(e) by refusing to bargain about the decision to create the return-to-work program; however, ERB nonetheless determined that the city did violate ORS 243.672(1)(e) and (f) by failing to give the association notice of the return-to-work program and refusing to bargain about the impacts of the program.

ERB reasoned:

"Prior to March 2007, Association members who went out on disability and who were permanently restricted from performing their regular jobs had no obligation to ever return to work at the Fire Bureau. As a result of the City's March 2007 return-to-work program, many of these individuals were required to return to jobs at the Fire Bureau or lose their disability benefits. Thus, the program clearly changed working conditions for disabled employees. In

addition, the return-to-work program changed conditions of employment that affected other Association bargaining unit members. In its return-to-work program, the City created new jobs with new salaries. The City also specified new requirements for filling these positions; these requirements barred all but permanently disabled Association bargaining unit members from filling these jobs. Accordingly, we conclude that the return-to-work program changed the status quo."

(Emphasis omitted.) Because the program concerned the city's right to assign work, however, ERB determined that the decision to create the program was a permissive—not a mandatory—subject of bargaining.[3] ERB then went on to determine that "the City's decision to implement a return-to-work program affects numerous working conditions that are mandatory subjects for negotiations, including salary, workload, promotional opportunities, and job security." Accordingly, ERB concluded that the city was required to bargain about the "numerous mandatory impacts of its decision." ERB also rejected the city's affirmative defense that it had already "bargained to completion" over the issues raised by the return-to-work program.

On judicial review, the city raises five assignments of error; we write only to address the city's fourth assignment of error.[4] The city, relying on *Association of Oregon Corrections Employees v. DOC*, 209 Or App 761, 770, 149 P3d 319 (2006), argues that ERB erred by failing to consider already existing CBA provisions, long-standing city policies, and the parties' course of conduct in determining that the city was required to bargain over the mandatory impacts of the decision to implement a return-to-work pilot program. The city contends that "[t]he return to work assignments[,] covering already existing bargaining unit members with already existing rights, did not happen in a vacuum" and that "ERB's reasoning on mandatory impacts fails to take into account

---

[3] ORS 243.650(7)(g) provides, in part, that " 'employment relations' excludes * * * assignment of duties."

[4] We reject without discussion the city's first three assignments of error, which pertain to whether the city had a duty to bargain over the reimbursement of post-retirement medical expenses of recalled employees in light of the enactment of Measure 26-93. In addition, the city conceded its fifth assignment of error in its reply brief.

already existing authority that answered any questions about impact." The association responds that ERB did not so err because the CBA "did not cover the new positions being created under the return to work program," the city "had never created 'restricted duty' positions for disabled workers and many questions arose from that choice," and "[i]t was clear to ERB that these issues had never been ironed out in formal negotiations despite the parties' attempt to work out a deal informally." For the reasons that follow, we conclude that ERB erred when it failed to construe the CBA before determining that the city's unilateral action in implementing the return-to-work program affected mandatory subjects of bargaining.

Under the Public Employees Collective Bargaining Act (PECBA), public employees have the right to "collective bargaining with their public employer on matters concerning employment relations." ORS 243.662. The term "employment relations" is statutorily defined by ORS 243.650(7) and includes, among other things, "matters concerning direct or indirect monetary benefits, hours, vacations, sick leave, [and] grievance procedures." ORS 243.650(7)(a). Matters that are within the statutory definition of "employment relations" are referred to as "mandatory" subjects of bargaining, whereas those matters that are outside the definition are known as "permissive" subjects of bargaining. *See Salem Police Employees Union v. City of Salem*, 308 Or 383, 390-91, 781 P2d 335 (1989) (describing the mandatory-permissive dichotomy and noting that it has been criticized and is not expressly incorporated into the governing statutes). It is an unfair labor practice for a public employer to "[r]efuse to bargain collectively in good faith with the exclusive representative" over mandatory subjects of bargaining. ORS 243.672(1)(e).

To lawfully change a mandatory subject of bargaining during the term of a CBA,

"the public employer must notify the exclusive representative of the anticipated change and complete the bargaining process. ORS 243.698(2). Even if the changed employment qualification does not concern a mandatory bargaining subject, the employer may still be required to bargain with the

exclusive representative concerning the *impacts* of the change. [*Salem Police Employees Union*, 308 Or at 393]."

*Beaverton Police Assoc. v. City of Beaverton*, 194 Or App 531, 536, 95 P3d 1160 (2004) (emphasis in original). However, impacts on otherwise mandatory subjects of bargaining that are insubstantial or *de minimis* do not trigger a duty to bargain. *See* ORS 243.650(7)(d) (" 'Employment relations' does not include subjects that have an insubstantial or de minimis effect on public employee wages, hours, and other terms and conditions of employment."); *Beaverton Police Assoc.*, 194 Or App at 536-37 (noting that "[t]he changed minimum qualifications for a sergeant position" (a permissive subject) had "an impact on monetary and nonmonetary benefits" (mandatory subjects) that satisfied ORS 243.650(7)(d)).

In sum, an employer breaches the duty to bargain during the term of a CBA by unilaterally implementing a decision that directly "changes" or derivatively "impacts" a mandatory subject of bargaining in a manner that is substantial enough to matter. *See Salem Police Employees Union*, 308 Or at 394 ("ERB is clear that the controlling question in determining if state law requires advance negotiation in good faith is whether the action or decision affects 'employment relations.' "). Put another way, if an employer's unilateral action sufficiently affects, either directly or derivatively, the status quo with respect to mandatory bargaining subjects, the employer had a duty to bargain. Where a "CBA authorizes an employer to act unilaterally with respect to certain conditions of employment, then changing those conditions is not a change in the status quo, and a failure to bargain before changing them cannot be an unfair labor practice." *Association of Oregon Corrections Employees*, 209 Or App at 769 (citing *Marion Cty. Law Enforcement Assn. v. Marion Cty.*, 130 Or App 569, 883 P2d 222 (1994), *rev den*, 320 Or 567 (1995)). It does not matter whether the alleged change is direct or derivative, *i.e.*, an impact. In either case, ERB must construe the CBA in the first instance, and, "[i]f the CBA is ambiguous, then ERB is required to resolve the ambiguity by examining extrinsic evidence of the contracting parties' intent, if such evidence is available." *Association of Oregon Corrections Employees*, 209 Or App at 770 (citation omitted).

Returning to the instant case, ERB made findings of fact respecting certain provisions of the CBA, including the management rights clause. ERB also made findings of fact regarding the city's March 2007 policy that implemented the return-to-work program. However, in reasoning that the status quo had been changed and that mandatory subjects of bargaining, including salary, workload, promotional opportunities, and job security, had been affected by the city's unilateral decision to implement the return-to-work policy, ERB did not construe the CBA for the purpose of determining whether it provided for or authorized those changes and impacts. It has been the city's contention throughout these proceedings, both below and on judicial review, that already existing CBA provisions authorized the city's actions and that no change occurred to mandatory bargaining subjects so as to trigger the city's duty to bargain. ERB, and not this court, must interpret, in the first instance, the pertinent provisions of the CBA to determine whether they authorized the city to unilaterally affect mandatory subjects of bargaining in the manner that it did.

Reversed and remanded for reconsideration.