Argued and submitted February 17, reversed and remanded November 9, 2011, petition for review allowed May 3, 2012 (352 Or 25)

ASSOCIATION OF OREGON
CORRECTIONS EMPLOYEES,
*Respondent,*

*v.*

STATE OF OREGON
and Department of Corrections,
*Petitioners.*

Employment Relations Board
UP3303; A143552

268 P3d 627

Leigh A. Salmon, Assistant Attorney General, argued the cause for appellant. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General. With her on the reply brief were John R. Kroger, Attorney General, and David B. Thompson, Interim Solicitor General.

Becky Gallagher argued the cause for respondent. With her on the brief was Garrettson, Gallagher, Fenrich & Makler, P.C.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

This is the second time that this case has come before this court on judicial review. The issue is the same: Where employees bid for work shifts on a schedule posted by the Department of Corrections (DOC), did the collective bargaining agreement (CBA) between the DOC and the Association of Oregon Corrections Employees authorize the DOC to unilaterally change the posted work schedule system? Previously, we held that the Employment Relations Board erred in ordering the DOC to bargain over the changes because the board required the DOC to show that the CBA demonstrated a "clear and unmistakable" waiver of the right to bargain schedule changes. Instead of the test that the board used, we held that the general rules of contract interpretation apply to the construction of the CBA and remanded to the board to apply that test. *Association of Oregon Corrections Employees v. DOC*, 209 Or App 761, 769-70, 149 P3d 319 (2006). On remand, the board concluded that the CBA was ambiguous and that, based on extrinsic evidence, the parties did not intend to allow the DOC to make such unilateral changes. The DOC petitioned for judicial review. We review the board's conclusion that the CBA is ambiguous for errors of law, *Arlington Ed. Assn. v. Arlington Sch. Dist. No. 3*, 196 Or App 586, 595, 103 P3d 1138 (2004), and conclude that the board erred because the CBA unambiguously allowed the DOC to make such unilateral changes. Accordingly, we reverse and remand.

We take the relevant undisputed facts from the board's order and the record. The parties' CBA covered the period from July 1, 2001 to June 30, 2003. The CBA provided that it remained in effect during the negotiation process for a new CBA.

The Management Rights clause, Article 3, authorized, among other things, the DOC to "schedule work." Article 28 defined the work week and described how the DOC would post work schedules. Article 28 also gave employees the right to bid on work schedules. The bidding process included an incumbency provision that allowed employees who placed two consecutive bids on the same shift to keep that shift unless a senior employee outbids the incumbent. As

stated, the issue in this case is whether the CBA authorized the DOC to unilaterally change the posted work schedule system.

In January 2003, the parties began negotiations on a successor CBA to the 2001-03 bargaining agreement. In May 2003, the association became aware that the DOC intended to post a new work schedule, beginning with the July-August 2003 shift bid schedule. The DOC's new work schedule would unilaterally change various assignments, the start times, and days off for a number of security employees. In effect, the DOC's proposed change eliminated the incumbency provision of the CBA. At a bargaining meeting on the successor CBA, the association's counsel informed the DOC that the proposed schedule changes affected mandatory subjects of bargaining, and, therefore, the DOC must first bargain before it implemented the new work schedule. The DOC did not concede that its proposed change was a mandatory subject of bargaining, but it did agree to meet with the association and discuss the issue outside the formal contract negotiation process. Two days later, the DOC informed all security employees that in the future they must bid on work schedules, including employees who held incumbencies. The DOC explained that it was implementing the new process and, for that reason, it was necessary for all employees to bid for new work schedules. The association and the DOC did later meet to discuss the schedule, but the parties did not reach an agreement. The DOC unilaterally implemented the new schedule. In response, the association president posted a memo to staff stating:

> "This is to inform all staff that the [association] does not agree with or support the wholesale changes to the Bid Schedule. There are over 130 changes to this schedule which equate to 60% of the schedule. Some of these changes should have been negotiated at the Bargaining table but were not. The [association] will pursue the avenues it has available to us."

The association filed an unfair labor practices complaint, alleging, among other things, that the DOC violated ORS 243.672(1)(e) in unilaterally altering schedule changes involving start-stop times and days off. The association also

alleged the changes concerned a mandatory subject of bargaining under ORS 243.650(7)(a) and, thus, would be a *per se* unfair labor practice. The board decided that the DOC committed an unfair labor practice because the CBA did not expressly authorize the DOC's unilateral action and did not provide a clear and unmistakable waiver by the association of the right to bargain. The board rejected the DOC's contention that the association waived its right to bargain by failing to make a timely demand. The DOC petitioned for judicial review, and we reversed and remanded, directing the board to correctly interpret the CBA and determine whether the CBA authorized the DOC to unilaterally change the posted work schedule system. *Association of Oregon Corrections Employees*, 209 Or App at 770. On remand, the board reconsidered the CBA, and again the board concluded that the CBA did not authorize the DOC to make that unilateral schedule change. The DOC petitions for judicial review a second time.

We first consider whether the board correctly construed the CBA. A CBA is a contract that is subject to the general rules of contract interpretation. *Marion Cty. Law Enforcement Assn. v. Marion Cty.*, 130 Or App 569, 575, 883 P2d 222 (1994), *rev den*, 320 Or 567 (1995). A contract must be enforced according to its terms. *Arlington Ed. Assn.*, 196 Or App at 595. The court can consider extrinsic evidence to determine if a contract is ambiguous. *Ambercombie v. Hayden Corp.*, 320 Or 279, 292, 883 P2d 845 (1994); *Connall v. Felton*, 225 Or App 266, 272, 201 P3d 219, *rev den*, 346 Or 257 (2009). The parties' prior course of conduct can be considered to establish that a contract term is ambiguous. *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 320, 129 P3d 773, *rev den*, 341 Or 366 (2006). If a contract is ambiguous— which occurs when the contract or a contract term can be reasonably given more than one plausible interpretation[f]" 'the trier of fact will ascertain the intent of the parties and construe the contract consistent with' that intent." *Arlington Ed. Assn.*, 196 Or App at 595 (quoting *OSEA v. Rainier School Dist. No. 13*, 311 Or 188, 194, 808 P2d 83 (1991)). If extrinsic evidence is insufficient to resolve the ambiguity, we resort to appropriate maxims of contractual construction. *Yogman v. Parrott*, 325 Or 358, 364, 937 P2d 1019 (1997).

Whether the terms in a contract are ambiguous is a question of law. *Arlington Ed. Assn.*, 196 Or App at 595. We begin with the relevant terms of the CBA. Two articles of the CBA bear on whether the DOC had authority to make unilateral schedule changes. Article 3, the management rights clause, provides:

"The Association agrees that the *Employer retains all inherent rights of management* and hereby recognizes the sole and exclusive right of the State of Oregon, as the Employer, to operate and manage its affairs in accordance with its responsibilities to maintain efficient governmental operations. The *Employer retains all rights* to direct the work of its employees, *including, but not limited to*, the right to hire, promote, assign, transfer, demote, suspend, or discharge employees for proper cause; *to schedule work*; determine the processes for accomplishing work; to relieve employees from duties because of lack of work or for other legitimate reasons; to take action as necessary to carry out the missions of the State; or determine the methods, means, and personnel by which operations are to be carried on, *except as modified or circumscribed by the terms of this Agreement.* The retention of these rights does not preclude any employee from filing a grievance, pursuant to Article 44, Grievance and Arbitration Procedure, or seeking a review of the exercise of these rights, when it is alleged such exercise violates provisions of this agreement."

(Emphasis added.) Thus, Article 3 authorizes the DOC to "direct the work of its employees, including, but not limited to, the right to * * * schedule work * * * except as modified or circumscribed by the terms of this Agreement." The parties disagree as to the breadth of the term "schedule work." The DOC urges that Article 3 includes the right to change the shift schedule for employee bidding. The association concedes that the DOC's interpretation is plausible, but the association also asserts that it is equally plausible that "schedule work" is limited to authorizing the DOC to determine when tasks will be performed.

We consider those arguments by examining the text of Article 3, in context. Article 3 grants the DOC authority to schedule work and limits that authority "as modified or circumscribed by the terms of this agreement." Accordingly, we

must look to other terms of the CBA that "modify or circumscribe" the DOC's right to schedule work. We turn to the second relevant Article of the CBA, Article 28, Working Conditions. Article 28, sections 1, 2, and 3 define the work week, working hours, and the work schedule. The work week could be five shifts of eight-hour days or four shifts of 10 hour days or three shifts of 12-hour days, with varying days off within the work week. Article 28, section 1, also provides, in part:

"If a variance from this paragraph [defining the work week] is required, * * * the Employer shall notify the Association of the reasons for the change prior to its effective date, and the Association shall be afforded an opportunity to comment and offer alternative suggestions. If the Association feels the change is unreasonable, the matter may be processed as a grievance."

Article 28, section 3, provides:

"Schedules showing each employee's shift * * * shall be posted * * * at all times. Except for [specified situations], the Employer will provide seven (7) days notice of changes in work schedules."

Article 28, section 7 A, describes the bidding process and provides, in part:

"Regular status employees * * * may bid for shifts and days off on a scheduled posted by the Employer * * * on the basis of their classification seniority * * *."

Article 28, section 1, does not expressly authorize the DOC to unilaterally change work schedules; but it does so implicitly, by requiring only that the DOC provide notice of future changes in work schedules. In addition, the language limiting the association to be "afforded an opportunity to comment" and allowing the association to file a grievance is evidence that the DOC was not required to bargain a change in the work schedule *before* imposing that change. Contrary to the association's argument, the fact that the parties agreed the association *may* file a grievance did not establish that the DOC agreed to negotiate a change in the work schedule *before* the DOC implemented that change. Rather, the language in Article 28, section 1, establishes that the DOC was required to notify the association. In a similar vein, Article

28, section 7 A, grants employees the right to bid on shifts and time off: "Regular status employees * * * may bid for shifts and days off on a schedule posted by [the DOC]." Thus, employees had a right to bid on schedules once the DOC created and posted a schedule. But the employees' rights were limited to the right to bid on the schedule posted by the DOC.

Read together, Article 3 and Article 28 of the CBA unambiguously authorize the DOC to unilaterally amend the schedule that it posted for employee bidding.[1] Article 3 gives the DOC the right to "schedule work." Although the CBA does not define the term "schedule work," Article 3 does provide that the DOC retains all rights "except as modified or circumscribed by the terms of this Agreement." Article 28 limits only the DOC's authority to schedule work by requiring it to *post* a schedule so that employees can bid for shifts and requires the DOC to provide seven days' notice before changing an employee's schedule, absent an emergency. That is, the only limitation that Article 28 imposes on the DOC's retained right to schedule work is Article 28's requirement that the DOC post notice of the work schedule at least seven days before implementing that new work schedule.

Nonetheless, the association contends that Article 3 could also plausibly be read to authorize the DOC to act unilaterally *only* with respect to permissive subjects of bargaining. Article 3 provides that the DOC "retains all inherent rights of management." According to the association, the DOC could "retain" a right only if it previously held the right. Further, the association argues that "inherent rights of management" is a term of art involving permissive subjects of bargaining. Thus, the association argues, "schedule work"

---

[1] While the issue here concerns the 2001-03 CBA, the parties have a history of prior bargaining practices, which the association suggests is relevant. For the 1999-2001 CBA, the DOC proposed a new section regarding shift schedule changes. When the parties did not agree on that issue, it was submitted to an interest arbitrator. The arbitrator selected the DOC's last best offer. In the past, the parties met to discuss proposed shift changes before the changes were implemented. For example, when the DOC proposed to change the Intensive Management Unit work shift from an eight-hour shift to a 12-hour shift, the association requested bargaining. The parties met and entered into a memorandum of understanding. We conclude that the parties' prior course of conduct does not create any ambiguity regarding Article 3, Management Rights. Prior CBAs contained the same management rights clause language. The fact that the DOC met with the association did not create any ambiguity regarding the DOC's right to schedule the work week.

could also plausibly be construed to authorize the DOC to schedule when tasks will be performed—a permissive subject of bargaining. The problem with the association's argument is that it is inconsistent with other language in Article 3. In Article 3, the DOC retains rights over other mandatory subjects of bargaining. Specifically, it authorizes the DOC to "demote, suspend, or discharge employees for proper cause." The association argues that, whether "the management rights clause contains only permissive subjects, only mandatory subjects, or a mixture of both does not change the ambiguity of what scheduling work means." We disagree. The premise of the association's argument is that Article 3 is limited to permissive subjects of bargaining, but that is plainly not the case.

Accordingly, the only plausible interpretation of the CBA is that the DOC retained the authority to unilaterally change the schedule that it posted for employee bidding. The board erred in concluding that the parties intended the CBA to mean something other than what it plainly said.

Public employers must bargain changes of conditions of employment that are mandatory subjects of bargaining. ORS 243.672(1)(e). As we said before in this case, if a "CBA authorizes an employer to act unilaterally with respect to certain conditions of employment, then changing those conditions is not a change in the status quo, and a failure to bargain before changing them cannot be an unfair labor practice." *Association of Oregon Corrections Employees*, 209 Or App at 769. Here, the CBA authorized the DOC to unilaterally change the work schedules for employees to bid on. In doing so, the DOC did not commit an unfair labor practice.

Reversed and remanded.