Argued and submitted August 21, 2012, affirmed July 31, 2013

MULTNOMAH COUNTY CORRECTIONS
DEPUTY ASSOCIATION,
*Petitioner,*

*v.*

MULTNOMAH COUNTY,
*Respondent.*

MULTNOMAH COUNTY,
*Respondent,*

*v.*

MULTNOMAH COUNTY CORRECTIONS
DEPUTY ASSOCIATION,
*Petitioner.*

Employment Relations Board
UP05710, UP06410; A149062

308 P3d 230

Thomas K. Doyle argued the cause and filed the briefs for petitioner.

Jacqueline A. Weber argued the cause for respondent. With her on the brief was Jenny M. Moore, Acting County Attorney for Multnomah County.

Michael J. Tedesco filed the brief *amicus curiae* for Oregon State Fire Fighters Council, AFL-CIO, SEIU Local 503, AFSCME.

Before Armstrong, Presiding Judge, and Duncan, Judge, and Brewer, Judge pro tempore.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

Petitioner Multnomah County Corrections Deputy Association seeks judicial review of a final order of the Employment Relations Board in which the board concluded that respondent Multnomah County did not violate its duty to bargain in good faith, ORS 243.672(1)(e), when it refused to bargain over the association's proposal for mandated training hours and, conversely, that the association violated its counterpart duty to bargain in good faith, ORS 243.672(2)(b), when it submitted that proposal, over the county's objections, as part of its final offer of settlement.[1] We affirm, although, as explained below, our reasoning differs slightly from the board's.

The key question in the case is whether the association's proposal that all sworn county corrections employees be provided a minimum number of hours of approved annual training—half of which were to be "DPSST-approved"[2]—presented a "safety issue" subject to mandatory collective bargaining. Under the Public Employees Collective Bargaining Act (PECBA), public employees have the right to bargain collectively "with their public employer on matters concerning employment relations." ORS 243.662. The definition of "employment relations" in ORS 243.650(7) circumscribes the matters that are "mandatory" for bargaining; matters that are excluded from the definition of employment relations are permissive subjects of bargaining. *Portland Fire Fighters' Assoc. v. City of Portland*, 245 Or App 255, 264, 263 P3d 1040 (2011) (citing *Salem Police Employees Union v. City of Salem*, 308 Or 383, 390-91, 781 P2d 335 (1989)). *See also Assn. of Oregon Corrections Emp. v. State of Oregon*, 353 Or 170, 176, 295 P3d 38, (2013) ("[A] public employer commits an unfair labor practice under ORS 243.672(1)(e) if it refuses to bargain with respect to matters that are included within, and not excluded by, the definition of 'employment relations.' Those matters are referred to as 'mandatory' subjects of bargaining."). It is an unfair labor practice for a public employer

---

[1] Although ORS 243.672 has been amended since the events that gave rise to this case, *see* Or Laws 2011, ch 593, § 2, those amendments do not affect our analysis. Therefore, we refer to the current version of the statute in this opinion.

[2] "DPSST" is an acronym for the Oregon Department of Safety Standards and Training.

or its designated representative, and, likewise, for a public employee or a labor organization or its designated representative, to "[r]efuse to bargain collectively in good faith" over mandatory subjects of bargaining. ORS 243.672(1)(e) (public employer); ORS 243.672(2)(b) (public employee/labor organization).

In 2007, the legislature amended the definition of employment relations in ORS 243.650(7) to provide that, for strike-prohibited employees, such as the corrections employees in this case,

> "'employment relations' includes *safety issues that have an impact on the on-the-job safety of the employees* or staffing levels that have a significant impact on the on-the-job safety of the employees."

Or Laws 2007, ch 141, § 1a; ORS 243.650(7)(f) (emphasis added). Under the previous version of the statute, only "safety issues" that had "a *direct and substantial effect on the on-the-job safety of public employees*" were included in the definition of "employment relations." *See* ORS 243.650(7)(f) (2005) (emphasis added).

Applying the amended statute for the first time, the board here concluded that the association's training proposal did not involve a "safety issue" because it did not, "directly and unambiguously address[ ] a matter related to strike-prohibited employees' workplace safety." The correctness of that conclusion is the central issue on judicial review. Based on our review of the text, context, and legislative history of the 2007 amendments to ORS 243.650(7), we agree with the board's conclusion that it must be apparent from the face of a proposal itself—that is, "directly" and without reference to extrinsic evidence—that the proposal involves a "safety issue." However, the board's introduction of a requirement of "unambiguousness" to the statute is not supported by its text, context, or history and, indeed, is contradicted by the expressed intention of the legislature. Thus, as we explain below, we conclude that the subject of a proposal is a "safety issue" for purposes of ORS 243.650(7)(f) if it would reasonably be understood, on its face, to directly address a matter related to the on-the-job safety of strike-prohibited employees. We further conclude that the proposal at issue here does

not meet that standard; therefore, we affirm the decision of the board.[3]

These facts are undisputed. The association, which is the exclusive representative for a bargaining unit of county corrections employees, and the county were parties to a collective bargaining agreement effective July 1, 2004, through June 30, 2010. In August 2008, the parties amended and extended that agreement; the amended agreement was effective August 14, 2008, and continues through June 30, 2014. In accordance with an addendum that allowed the parties to "reopen" certain articles of the 2008-2014 agreement—including two each of the parties' choosing—the parties began "limited reopener" bargaining on March 26, 2010.

The association identified Article 17, "Corrections Service and Training Achievement Program" as one of the articles that it wanted to modify, and it submitted a formal proposal, which, among other things, sought to add the following:

"5.  Training. The Sheriff will establish training requirements for Corrections Deputies and Corrections Sergeants. *Beginning in the second year of this agreement, all sworn employees shall receive a minimum of forty (40) hours of approved training per year, of which at least twenty (20) hours shall be DPSST-approved training.* The employee shall participate in training, including firearms training, at times set by the Sheriff or his designees. Employees participating in any required training during off-duty hours shall be compensated at the overtime rate for time spent in training, or may be permitted to flex hours with the approval of their supervisor."

(Emphasis added; boldface and underscoring omitted.) The county declared that the proposal for a guaranteed 40 hours of training each year (set out in italics above) was a permissive subject of bargaining and refused to bargain over it. The association nonetheless included that proposal in its final offer submitted to the state conciliator under ORS 243.712(2)(b).[4]

---

[3] The association raises additional assignments of error that, as explained later in this opinion, 257 Or App at 728 n 16, 734-35, 735 n 26, 735-37, we also reject.

[4] ORS 243.712(2)(b) provides, in part, that,"[w]ithin seven days of the declaration of impasse, each party shall submit to the mediator in writing the final offer of the party[.]"

Each party filed an unfair labor practice complaint with the board. The association contended that the county had violated its duty to bargain in good faith under ORS 243.672(1)(e) by refusing to negotiate about the proposal. The county contended that it had no duty to bargain over the proposal, because it was "permissive" rather than "mandatory," and, consequently, the association had violated its good-faith bargaining obligation under ORS 243.672(2)(b) by including the proposal in its final offer to the state conciliator. *See Amalgamated Transit Union, Division 57 v. Rogue Valley Transportation District,* 16 PECBR 559, 588, *order on recons,* 16 PEBCR 707 (1996) (a party violates duty to bargain in good faith by including a permissive subject in its final offer over the objections of the other party). The board ruled in favor of the county on both complaints.

The board first considered the meaning of "safety issues" as used in ORS 243.650(7)(f), which, again, provides, as pertinent:

> "For employee bargaining involving employees covered by ORS 243.736,[5] 'employment relations' includes *safety issues that have an impact on the on-the-job safety of the employees*[.]"

(Emphasis added.) After considering the text and context, the legislative history offered by the association, and the rationale of the board's prior cases interpreting the pre-2007 version of the statute, the board concluded that "the subject of a proposal is a 'safety issue' if the proposal *directly and unambiguously addresses a matter related to* strike-prohibited employees' workplace safety." (Emphasis added.) Applying that test, the board determined that, in this case, because the connection between training and safety was not apparent from the proposal's text, but only after considering extrinsic evidence of the "intent" of the proposal, the subject of the proposal was not a "safety issue." Having so concluded, the board did not reach the question whether the proposal fulfilled what it considered the second criterion for determining whether a subject is

---

[5] ORS 243.736(e) provides that it is unlawful for, among others, a "[g]uard at a correctional institution or mental hospital" "to strike or recognize a picket line of a labor organization while in the performance of official duties."

mandatory under ORS 243.650(7)(f)—"*i.e.*, whether it impacts strike-prohibited employees' on-the-job safety." The board also determined that the subject of the proposal was, instead, "assignment of duties," which is excluded from the definition of "employment relations" under ORS 243.650(7) (g).[6] Consequently, the board concluded, the county did not violate its good-faith bargaining obligation in refusing to bargain over the proposal and the association violated its obligation by including it in its final offer.

The chair of the board, Gamson, dissented. Gamson contended, among other things, that the majority misinterpreted the association's proposal.[7] In Gamson's view, the proposal's reference to "*DPSST-approved* training" is a term of art in the law enforcement industry, the meaning of which, under *Yogman v. Parrott*, 325 Or 358, 362-63, 937 P2d 1019 (1997), is properly determined by looking to outside sources—in this case, evidence in the record—to determine what the proposal means on its face. That evidence, Gamson asserted, establishes that DPSST training for corrections officers "so obviously involve[s] officer safety that no argument is necessary to establish the point." According to Gamson, with that understanding of the term "DPSST-approved training," and considering the disputed provision in the context of the association's proposal as a whole, including its reference to firearms training, the proposal does, in fact, on its face concern safety, and the majority erred in concluding otherwise.

On review, the association's first, and primary, contention is that the board erred in interpreting "safety issue," as used in ORS 243.650(7)(f), "to include only proposals [that] 'directly and unambiguously' address matters related to workplace safety." The association argues that the ordinary meaning of the terms "safety" and "issue"—as well as the statute's reference to "issue" rather than "subject," which appears elsewhere in ORS 243.650(7)—evidence the legislature's intention that "safety issues" be understood to sweep more broadly than is allowed under the "subject

---

[6] ORS 243.650(7)(g) provides, in part, that "'employment relations' excludes *** assignment of duties.'"

[7] Gamson also contended that the board's interpretation of the statute was inconsistent with its plain meaning and the legislature's expressed intention to "expand the scope of safety issues that are mandatory for bargaining."

inquiry" that the board used. Further, according to the association, the board's interpretation is inconsistent with its prior cases, which the association contends stand for the proposition that a proposal is a safety issue simply if it "concerns" safety. And, in the association's view, the legislative history "clear[ly]" and "unequivocal[ly]" supports its reading of the statute that training is a "safety issue."

The county responds that the board's interpretation is correct, given the ordinary meaning of the word "safety," the board's prior interpretation of the phrase "safety issues" as used in the pre-2007 version of the statute (which there is no indication the legislature intended to change in 2007), the legislative history of the 2007 amendments, and what it asserts is this court's deference, in the absence of contrary legislative intent, to the board's "expertise in regard to its rulings relating to policy-based formulation of rules." We agree with the county, but only to a point.

The association contends, in part, that the ordinary meaning of the words "safety" and "issue" lead to the conclusion that a "safety issue" is a "matter in dispute between two parties that relates to freedom from exposure to danger," a broader standard than that articulated by the board. That position, however, is not borne out by the relevant statutory context.[8] *Vsetecka v. Safeway Stores, Inc.*, 337 Or 502, 508, 98 P3d 1116 (2004) ("Ordinarily, * * * text should not be read in isolation but must be considered in context." (Internal quotation marks omitted.)). Context includes other provisions of the same and related statutes, *see Hale v. Klemp*, 220 Or App 27, 32, 184 P3d 1185 (2008) ("When we examine the text of the statute, we always do so in context, which includes, among other things, other provisions of the

---

[8] Nor does it necessarily follow from the dictionary definitions of the relevant terms. "Safety" is defined to mean, in this context, "the condition of being safe : freedom from exposure to danger : exemption from hurt, injury, or loss." *Webster's Third New Int'l Dictionary* 1998 (unabridged ed 2002). "Issue," as pertinent here, could mean, among other things, "a point in question of law or fact," "a matter that is in dispute between two or more parties or that is to be disputed by the parties : a point of debate or controversy," or "a matter not yet finally settled and on the settlement of which something else depends : a pregnant unsettled matter : vital question <burning ~ of the day>," or "a controverted subject or topic <the ~ of desegregation>." *Id*. at 1201.

statute of which the disputed provision is a part."), as well as prior versions of the statute, *see Krieger v. Just*, 319 Or 328, 336, 876 P2d 754 (1994) ("[W]ording changes adopted from session to session are a part of context of the present version of the statute being construed."). *See also Montgomery v. City of Dunes City*, 236 Or App 194, 199, 236 P3d 750 (2010) ("Changes in the text of a statute over time are context for interpreting the version at issue in a given case.").

The history of the statute is particularly informative in this case. Before 1995, the definition of "employment relations" did not specifically address safety issues; rather, the board decided whether a safety-related bargaining proposal was an "other condition of employment"—and, therefore, "employment relations" subject to mandatory bargaining under what is now ORS 243.650(7)(a)[9]—by weighing the effect of the bargaining proposal on management prerogatives against the effect of the proposal on employment conditions of the affected employees.[10] As the board here explained it, citing, among other cases, *Salem Police Employees Union v. City of Salem*, 8 PEBCR 6642, 6647 (1984), "[i]f the proposal or policy had a greater effect on workers' safety than on management prerogatives, we concluded [that] the subject was safety" and, therefore, a "condition of employment" subject to mandatory bargaining.

Then, in 1995, the legislature passed Senate Bill (SB) 750, which, among other changes, added several new paragraphs to ORS 243.650(7), further defining "employment

---

[9] ORS 243.650(7)(a) provides:

"'Employment relations' includes, but is not limited to, matters concerning direct or indirect monetary benefits, hours, vacations, sick leave, grievance procedures *and other conditions of employment*."

(Emphasis added.). Until 1995, that was the full extent of the definition of "employment relations." *See* ORS 243.650(7) (1993).

[10] That balancing test is now codified at ORS 243.650(7)(c), which provides:

"After June 6, 1995, 'employment relations' does not include subjects that the Employment Relations Board determines to have a greater impact on management's prerogative than on employee wages, hours, or other terms and conditions of employment."

*See Eugene Police Employees' Assoc. v. City of Eugene*, 157 Or App 341, 354, 972 P2d 1198 (1998), *rev den*, 328 Or 418 (1999) ("The only tenable understanding of subsection (7)(c) is that it codifies the balancing test that ERB has used to determine whether a subject that is not listed in subsection 7(a) is a condition of employment.").

relations." As particularly relevant here, SB 750 added paragraph (f), which provided, in part:

> "(f)   For all other employee bargaining except school districts, 'employment relations' expressly excludes staffing levels and safety issues (except those staffing levels and safety issues which have a direct and substantial effect on the on-the-job safety of public employees)[.]"

Or Laws 1995, ch 286, § 1. Consequently, after the enactment of SB 750, except with respect to school-district bargaining, only safety issues that had "a direct and substantial effect on the on the job safety of public employees" were included in the definition of "employment relations" (and therefore subject to mandatory bargaining); otherwise, they were expressly excluded.

In 2007, the legislature revisited subsection (7)(f). Specifically, and as relevant here, Senate Bill (SB) 400 amended ORS 243.650(7) as follows (additions are indicated in bold; deletions are bracketed in italics):

> "**(f)   For employee bargaining involving employees covered by ORS 243.736, 'employment relations' includes safety issues that have an impact on the on-the-job safety of the employees or staffing levels that have a significant impact on the on-the-job safety of the employees.**
>
> "[*(f)*] **(g)**   For all other employee bargaining except school [*districts*] **district bargaining and except as provided in paragraph (f) of this subsection,** 'employment relations' excludes staffing levels and safety issues (except those staffing levels and safety issues [*which*] **that** have a direct and substantial effect on the on-the-job safety of public employees), scheduling of services provided to the public, determination of the minimum qualifications necessary for any position, criteria for evaluation or performance appraisal, assignment of duties, workload when the effect on duties is insubstantial, reasonable dress, grooming, and at-work personal conduct requirements respecting smoking, gum chewing, and similar matters of personal conduct at work, and any other subject proposed that is permissive under paragraphs (b), (c) and (d) of this subsection."

Or Laws 2007, ch 141, § 1a. Thus, in 2007, the legislature created, by amendment to paragraph (f) of subsection (7), a separate rule for bargaining involving employees covered by ORS 243.736—that is, strike-prohibited employees—and essentially retained, in new paragraph (g), the pre-2007 rule for all other employee bargaining except school-district bargaining. And, under the new rule for strike-prohibited employees, a "safety issue" need only have *"an impact,"* rather than *"a direct and substantial effect"* on the employees' on-the-job safety, in order to be subject to mandatory bargaining, ORS 243.650(7)(f), whereas the "direct and substantial effect" test continued to apply to other employee bargaining, ORS 243.650(7)(g).

Significantly, in enacting the 2007 amendments, the legislature retained the phrase "safety issues" from the pre-2007 version of the rule—both in establishing the new rule that applied to bargaining for strike-prohibited employees and in continuing the existing rule for other employee bargaining. Consequently, as the parties recognize, the board's construction of that phrase in prior cases is important context in determining the meaning of the 2007 amendments. *See, e.g.*, *State v. Cloutier*, 351 Or 68, 99, 261 P3d 1234 (2011) ("Although, in the abstract, there is nothing that precludes the legislature from defining the same terms to mean different things in the same or related statutes, in the absence of evidence to the contrary, we ordinarily assume that the legislature uses terms in related statutes consistently."); *Mastriano v. Board of Parole*, 342 Or 684, 693, 159 P3d 1151 (2007) ("[W]e generally presume that the legislature enacts statutes in light of existing judicial decisions that have a direct bearing on those statutes.").

Before turning to those cases, however, we first dispose of the association's argument (echoing Gamson's dissent) that the board misinterpreted the statute by analyzing whether the *subject* of a proposal is safety, because paragraph (f)—unlike some other portions of subsection (7)—does not expressly use the word "subject." We are not persuaded.

As discussed above, 257 Or App at 715-16, subsection (7) defines "employment relations," which, in turn,

determines whether a matter—in this case, a "safety issue"—is a mandatory *subject* of collective bargaining. *See Salem Police Employees Union,* 308 Or at 391 ("Under Oregon statutes a public employer and represented public employees must bargain about *subjects* within the definition of 'employment relations.' While the law does not prohibit bargaining about any other *subject* as well, the rights and duties extend only so far as does the statutory definition." (Emphasis added.)). Given that understanding, the fact that the legislature did not repeat the word "subject" in paragraph (f) does not, as the association contends, lead to the conclusion that the legislature intended a different analytical approach to apply with respect to safety. Indeed, the legislature, in describing the scope of "employment relations" throughout subsection (7), did not consistently repeat the word "subject" as the referent.[11] But, read as a whole, it is clear that that is what the legislature intended. There is nothing in the context or, as discussed below, in the legislative history of the provision, to indicate that the legislature intended a distinction based on that inconsistent usage.[12] In short, we reject the association's assertion that the phrase "safety issues" is intended to invoke a broader inquiry than if the legislature had specifically referred to safety as a "subject" rather than an "issue."

Having resolved that issue, we turn to the board's decisions applying the pre-2007 version of ORS 243.650(7)(f).

---

[11] *Compare* paragraph (a) ("'Employment relations' includes, but is not limited to, *matters* concerning direct or indirect monetary benefits, hours, vacations, sick leave, grievance procedures and other conditions of employment." (Emphasis added.)), *with* paragraph (d) ("'Employment relations' does not include *subjects* that have an insubstantial or de minimis effect on public employee wages, hours, and other terms and conditions of employment." (Emphasis added.)). To further illustrate, subsection (e) provides, "For school district bargaining, 'employment relations' excludes class size, the school or educational calendar, standards of performance or criteria for evaluation of teachers, the school curriculum, reasonable dress, grooming and at-work personal conduct requirements respecting smoking, gum chewing and similar matters of personal conduct, the standards and procedures for student discipline, the time between student classes, the selection, agendas and decisions of 21st Century Schools Councils established under ORS 329.704, requirements for expressing milk under ORS 653.077, *and any other subject proposed that is permissive under paragraphs (b), (c) and (d) of this subsection.*" (Emphasis added.)

[12] As to context, the word "subject" was also absent in the pre-2007 iteration of subsection (7)(f), and nothing in the board's interpretation and application of that formulation indicates that "subject" is not the proper referent.

As noted, the county contends that those cases support the board's understanding that, for a proposal to involve a "safety issue" under the present version of subsection (7)(f), it must directly and unambiguously address a matter related to workplace safety. The association argues that the cases do not support such a narrow, "four corners" reading of the proposal, but instead demonstrate that a proposal need only "*concern* safety" to be considered a "safety issue" under the statute. (Emphasis added.) And, in the association's view— as amplified at oral argument—a proposal "concerns" safety if it could "conceivably" relate to safety. According to the association, it is the second prong of the statute—the one the board did not reach, *viz.*, whether the proposal "impacts" workplace safety—that serves to narrow the inquiry.

We begin with *Roseburg Firefighters Association, IAFF Local 1110 v. City of Roseburg*, 17 PECBR 611 (1998) (*Roseburg*). One of the issues before the board in *Roseburg* was whether the city had a duty to bargain its decision to reduce minimum staffing levels in the city fire department. As relevant here, the city contended that the issue was "staffing" and, thus, a "permissive" subject of bargaining, while the association argued that the issues were "safety" and "workload," which, before the 1995 enactment of SB 750, were "typically found to be mandatory bargaining subjects." *Id.* at 629. The board concluded, however, that it was essentially immaterial whether the subject was staffing or, instead, safety and workload, because, under ORS 243.650(7)(f), as amended by SB 750 (1995), "both staffing and safety are now expressly permissive, unless they have a direct and substantial effect on the on-the-job safety of public employees," *id.* at 629 (internal quotation marks omitted), and the evidence in the record did not meet that test, *id.* at 631.[13] Thus,

---

[13] Specifically, the board concluded:

"Regardless of whether the subject of a proposal is determined to be staffing or safety or workload, we must decide its bargaining status based on whether the evidence establishes that the proposal will have a direct and substantial effect on employee safety, or what effect, if any, it will have on employee duties. Under the new statutory scheme, when the subject of a proposal concerns safety, staffing, or workload, we are required to determine its effect in order to determine its bargaining status."

*Id.* at 629-30. We are not persuaded that the board's use of the phrase, "concerns safety," in the final sentence of that explanation supports the association's broad interpretation of "safety issue." As discussed, because the evidence did not satisfy

*Roseburg* provides limited contextual guidance as to the meaning of "safety issue" because the board did not need to reach that question.

However, the board did note that, even without the "direct and substantial" test added by the SB 750 (1995) amendments, it was "doubtful that [the] Board would have found the subject of the Association's proposals to be safety," because, as in one of its pre-SB 750 cases, *Polk County v. Polk County Deputy Sheriff's Association*, 6 PECBR 4641 (1981), "the Association's proposal on its face addresses only staffing levels" and "does not address safety." *Roseburg*, 17 PECBR at 630 n 25.

The next case, *Federation of Oregon Parole and Probation Officers v. Washington County*, 19 PECBR 411 (2001) (*FOPPO*), involved the county's implementation of a policy that prohibited employees from carrying firearms while on duty and from carrying firearms while on county property while either on or off duty. The county argued, in part, that, although "the policy concerns the subject of employee safety," bargaining was permissive, rather than mandatory, under the board's earlier precedent. *Id.* at 416. The board "agree[d] with the County that the policy concerns safety."[14] *Id.* at 426. Among other things, the board noted that

> "[t]he policy states that it is intended to protect employees from physical harm that could result from accidental or intentional discharge of firearms while the employees are on duty or when they are off duty but on County premises. It is also intended to minimize the potential for intimidation that might occur with firearms present on County property."

*Id.* Thus, in *FOPPO*, it was evident from the policy itself that it directly and unambiguously affected a matter related to safety—minimizing the risk of harm associated with firearms.

the "direct and substantial effect" on employee safety standard in any event, the board in *Roseburg* did not need to decide whether the proposal initially presented a "safety issue."

[14] The board ultimately disagreed, however, with the county's argument that the policy was not a mandatory subject of bargaining, because, as the board found, the policy also had a "direct and substantial effect" on on-the-job safety. 19 PECBR at 426-27.

Similarly, in *Service Employees International Union Local 503, Oregon Public Employees Union v. State of Oregon, Department of Administrative Services, and the Homecare Commission*, 20 PECBR 144 (2002), the board did not resort to extrinsic evidence to determine whether the subject of the union's proposal, which would have required the public employer to pay its home-care workers for Hepatitis A and B immunizations if they requested them, was safety (as well as health benefits). Rather, the board stated, "The subject of the proposal may also be characterized as concerning safety, since it seeks to provide protection to workers from serious infectious diseases to which they could be exposed on the job." *Id.* at 158. The board concluded that, regardless of the label attached—health benefits or safety—the policy was mandatory for bargaining. *Id.* at 157.

Finally, in *SEIU Local 503, OPEU v. State of Oregon, Oregon State Hospital*, 20 PECBR 189 (2003), SEIU alleged that implementation of a policy discontinuing the use of steel handcuffs to restrain patients at the Oregon State Hospital (OSH) required bargaining. The board agreed with the administrative law judge that "the record does not establish that the ban on steel handcuffs had a direct and substantial effect on employee safety, and that [SEIU's] complaint should be dismissed." *Id.* at 190. The board described the "precise question" before it as "whether the ban on this particular method of restraint—steel handcuffs—increases the risk of injury to employees at OSH *so that it has a direct and substantial effect on employee safety.*" *Id.* at 195 (emphasis added). Thus, although the board also stated, "The *record in this case* demonstrates that patient assaults, and the use of patient seclusion and restraint procedures, are safety issues for both patients and staff," *id.* (emphasis added), we understand that it did so in the context of answering that question—that is, whether the ban had a direct and substantial effect on employee safety—not the predicate question whether the subject of the policy was a safety issue—and concluded that it did not.[15]

---

[15] In *SEIU*, the board did not expressly address the initial question, *viz.*, whether the proposal involved a safety issue; however, as in *Roseburg*, given its ultimate conclusion, it was not necessary for it to do so.

Although admittedly not overwhelming, we conclude that the board's earlier pronouncements provide contextual support for the board's interpretation in this case that, for a proposal or policy to present a "safety issue" under ORS 243.650(7)(f), it must be plain from the proposal itself that it addresses a matter of workplace safety.[16]

We turn to the legislative history surrounding the enactment of the 2007 amendments to ORS 243.650(7)(f). As noted, the association contends that the legislative history "unequivocal[ly]" supports its position that the legislature intended training to be considered a safety issue subject to mandatory, rather than permissive, bargaining and is "ultimately dispositive" in its favor. For that proposition, the association relies heavily on a colloquy between Senators Prozanski and Devlin on the floor of the Senate, in which Prozanski, a co-sponsor and the carrier of the bill in the Senate, responded to a series of questions involving examples of issues that would *not* be subject to mandatory bargaining under the then-existing law, as a way of demonstrating the need for a change.[17] In particular, the association points to the following exchange:

"[Sen Devlin:] I'm representing correctional employees at a county facility. We're concerned because of some of the issues that we've had relative to dealing with people that are incarcerated with mental illness. I would like to see there be more training for us dealing with mental illness issues. I want to bring it up in bargaining. What's your response?

"[Sen Prozanski:] My response would be [that] as the employer I have the, I guess the opportunity to say yes or no to that. I would say no as an employer because I am not required under the current statute to allow any discussions to take place at the collective bargaining table as it pertains to safety.

---

[16] That conclusion also disposes of the association's second assignment of error, in which it contends that the board improperly deviated from prior agency practice.

[17] The association also points us to language in Governor Kulongoski's statement signing the bill into law. We do not see how that provides evidence of the *legislature's* intentions in passing the bill, and the association does not explain how it could; accordingly, we do not discuss it further.

"* * * * *

"[Sen Devlin:]   Thank you, Mr. President. Colleagues. I think we've had a demonstration here about why this issue should be moved from permissive to mandatory. * * * There are a lot of red herrings in this particular bill. None of those really * * * are substantive. The real issue is that prior to 1995 when * * * public safety employees could bargain on safety related issues, none of these horror stories ever occurred. * * * This is something that should be put back on the table."

Audio Recording, Senate Floor Debate, SB 400, Mar 7, 2007, at 47:35 (statements of Sen Floyd Prozanski and Sen Richard Devlin), http://www.leg.state.or.us/listn/archive/archive.2007s/SENATE-200703071059.ram (accessed July 25, 2013).[18] Thus, the association argues, "the legislature appears to have explicitly considered the subject that is under dispute in this matter—corrections officer training—and explicitly passed the bill to ensure that training is a mandatory subject."

Although we agree with the association that a floor statement by the bill's carrier can be revealing as to the legislature's intention in enacting a bill, *see, e.g., Crooked River Ranch Water Company v. PUC*, 224 Or App 485, 492, 198 P3d 967 (2008), in our view, the quoted exchange cannot bear the weight that the association ascribes to it here. The most that can be gleaned from that exchange is that the senators contemplated that training "relative to dealing with people [who] are incarcerated [and suffer from] mental illness" would be considered a safety issue. It does not indicate that the legislature intended the principle to apply to a generic, open-ended training proposal. Indeed, even without that legislative history, it is easy to imagine that a proposal for training corrections officers on interacting with mentally ill inmates would be considered a "safety issue" under the standard we articulate here—that is, it would be apparent

[18] Other examples included concerns about the maintenance of laptops in vehicles of state troopers or the maintenance of respirators for fire fighters. We agree with the association that this, and the other legislative history presented by *amici*, discussed below, indicates that the legislature intended for subsection (7)(f) to have a broad reach. As the legislative history also demonstrates, however, that reach is not without limits.

from its face that it addresses a matter related to workplace safety. But that type of targeted proposal is not what the board was confronted with in this case.

Several labor unions—the Oregon State Fire Fighters Council, Oregon American Federation of Labor and Congress of Industrial Organizations, Oregon Service Employees International Union, Local 503, and American Federation of State, County and Municipal Employees, Council 75—filed a brief *amici curiae*, also urging us to reverse the board's decision. Presenting a more detailed legislative history of SB 400, *amici* argue that, "by continuing to focus on the definition of 'safety issues,' and whether a proposal raises something that on its face is a safety issue, the [b]oard misses the point of the [2007] legislative changes," which was to broaden the scope of safety issues that could be mandatory subjects of bargaining.[19]

It is beyond dispute that the purpose of SB 400 was to expand the scope of safety and staffing matters that are subject to mandatory bargaining. As *amici* emphasize, there was repeated testimony by proponents of SB 400 that it was designed to increase the ability of strike-prohibited employees to force employers to bargain over safety issues that affect the on-the-job safety of those employees, an ability that had been restricted with the passage of SB 750 in 1995. However, it appears that the legislature accomplished that goal by requiring only that a proposal have "an impact" on safety to be a mandatory subject of bargaining, rather than the heightened "direct and substantial effect" standard that had been in effect since 1995. Senator Prozanski, who, as noted, was a co-sponsor of SB 400, emphasized in committee that the bill was intended to obligate employers to discuss safety issues and to "actually get us back to where we were pre-1995"—that is, before SB 750, under which "safety and staffing issues were not included in the definition of employment relations and therefore were no longer a mandatory bargaining issue unless they have a direct and substantial effect [on the] on-the-job safety of public employees." Audio

---

[19] They also argue that the legislature was well aware of the increased need for bargaining over workplace safety issues and that the board's decision, if upheld, will have a negative effect on the safety of Oregon public employees and undermine the policy interests served by PECBA.

Recording, Senate Committee on Commerce, SB 400, Feb 7, 2007, at 1:00:11, 59:20 (statement of Sen Prozanski), http://www.leg.state.or.us/listn/archive/archive.2007s/SCOM-200702071505.ram (accessed July 25, 2013). There is nothing in the extensive legislative history to indicate that the legislature intended to change the initial inquiry used by the board to determine whether a proposal presents a "safety issue" in the first place.

The closest the legislature came to addressing that question occurred during a discussion of amendments to the bill offered—and ultimately adopted—by the House Committee on Business and Labor.[20] As introduced, and initially passed by the Senate, SB 400 would have amended subsection (f) to provide:

> "For employee bargaining involving employees covered by ORS 243.736, 'employment relations' includes staffing levels and safety issues that have a *potential* impact on the on-the-job safety and the workload of the employees."

SB 400, § 1 (emphasis added). However, when SB 400 reached the House Committee on Business and Labor, proponents offered amendments to address concerns that had been raised in the Senate by employers that the use of the word "potential" to modify "impact" was overly broad and would require bargaining over anything that could *conceivably* be considered to affect safety. Among other changes, the amendments deleted the modifier "potential" in favor of, simply, "an impact." [21] Bill File, House Committee on Business and Labor, Mar 14, 2007, House Amendments to Senate Bill 400; Audio Recording, House Committee on Business and Labor, Mar 14, 2007, at 7:30 (statement of Brian

---

[20] SB 400 was the subject of significant debate in both houses of the legislature and was amended several times before it was finally enacted.

[21] Although the bill was further amended by the House Committee on Business and Labor on two later occasions, that change remained in the final, enacted version of the bill. Again, the version that passed the House and was ultimately enacted into law amended subsection (7)(f) to read as follows:

> "For employee bargaining involving employees covered by ORS 243.736, 'employment relations' includes safety issues that have an impact on the on-the-job safety of the employees or staffing levels that have a significant impact on the on-the-job safety of the employees."

*See* SB 400 C-Engrossed, May 2, 2007; Or Laws 2007, ch 141, § 1a.

DeLashmutt, representing the Oregon Council of Police Associations, the Oregon State Police Officers' Association, the Association of Oregon Corrections Employees, and the Federation of Oregon Parole and Probation Officers), http://www.leg.state.or.us/listn/archive/archive.2007s/HBL-200703141445.ram (accessed July 25, 2013). As a proponent of the amendment, Brian DeLashmutt, explained, in that way, the bill

> "could still accomplish what we need to have accomplished, protecting the employees, giving them * * * the rights to be able to bargain over safety and staffing but not putting an undue hardship on the employers and opening what I guess they explained as [a] Pandora's box about potential safety issues."

*Id.* at 8:42. Cautioning that the term "safety" by itself—that is, without the modifier "potential"—was subject to possible misinterpretation by the board, he further explained:

> "And I think in layman's terms what we're trying to accomplish here is a standard in which *any reasonable person, who would be the employee, the employer, or an arbiter, would come to the conclusion that the issue has a relationship to safety.* In straightforward language that's what we're attempting to accomplish by deleting potential but leaving the word safety."

*Id.* at 8:57 (emphasis added). Later, in response to a question by Representative Vicki Berger as to what he meant by the board possibly misinterpreting the word "safety," DeLashmutt clarified:

> "[A]ll I was trying to portray to you is that *we don't want to have silence on the word 'potential' being left out so that anybody believes that really the intent of the legislature was that we go back to an after the fact standard, that you have to have an accident, an occurrence that actually happens, that injures somebody before you're required to bring that issue up.* And that's why I was trying to think in my mind, in plain language, the reasonable * * * person kind of standard. And included in that, obviously I believe the employers and the employees and potentially, at the final end, the arbitrator, would use the standard as a reasonable person and they're the final judge of that."

*Id.* at 12:56 (emphasis added). Representative Holvey, vice-chair of the committee, confirmed that understanding. *Id.* at 14:01 (statement of Rep Paul Holvey) ("[W]e mean the plain language * * * that somebody with a reasonable look at this would say this affects safety and therefore should be able to be talked about rather than having to look back after somebody's dead and say, well maybe this is a safety issue now. So I think that is the intent of this legislation * * * to make sure that we are looking at safety issues that a reasonable person would consider a safety issue."). The chair of the committee agreed, adding, "Whether you support this or not any reasonable person is going to interpret that these issues are directly related to and have a relationship with the subject matter of safety. That's why we're here." *Id.* at 14:46 (statement of Rep Mike Schaufler). Representative Rosenbaum concurred with the comments of both Representative Holvey and Chair Schaufler, *id.* at 15:28 (statement of Rep Diane Rosenbaum), and the "dash 5" amendments were adopted by the committee. *See* SB 400 (2007)-A Engrossed.

Thus, from that discussion, it is apparent that the legislature wanted to ensure that the amendments not be understood, on one end of the spectrum, to require an after-the-fact assessment before something would be considered a "safety issue" or, on the other end, to include matters that involved merely "potential" safety issues. Instead the legislature sought to draw a middle ground, expressing its intention that employers be required to bargain over proposals that were *reasonably understood* to involve safety issues.[22] And, it is based on that legislative history that we take issue with the board's announced standard. Although nothing about the legislative history indicates that the legislature

---

[22] This "reasonable person" standard was reiterated in later discussions of the bill. *See* Audio Recording, House Committee on Business and Labor, SB 400-B Engrossed, Apr 27, 2007, at 1:58 (statement of Brian DeLashmutt, indicating that employees or employee groups would have the ability to talk about safety issues based upon a reasonable person standard), http://www.leg.state.or.us/listn/archive/archive.2007s/HBL-200704271501.ram (accessed July 25, 2013); Audio Recording, House Floor Debate, SB 400-C Engrossed, May 8, 2007, at 5:14 (statement of Rep Schaufler, noting that "this language will still apply the reasonable person standard as it relates to a discussion of safety and staffing levels"), http://www.leg.state.or.us/listn/archive/archive.2007s/HOUSE-200705080829.ram (accessed July 25, 2013).

anticipated consideration of anything other than a "four corners" reading of a proposal itself to determine whether it involves a "safety issue"—which is consistent with the board's requirement that the proposal "directly" address safety—it is also clear that the legislature intended that that determination be based on a common sense, reasonable person, reading of the proposal. In our view, introducing the notion of "ambiguity" (or, more precisely, the lack thereof), as the board also did, is inconsistent with that stated intention and establishes a more demanding standard than the legislature intended to impose.[23] Although it may be a fine distinction, in light of the clear legislative intention to be *inclusive* in expanding the scope of safety issues subject to mandatory bargaining, it also is an important one.

In sum, we agree with the board's interpretation of the statute, but only to a point. Rather, we conclude, from the text, context, and legislative history of the statute that a matter involves a safety issue for purposes of ORS 243.650(7)(f) if it would reasonably be understood, on its face, to directly address a matter related to the on-the-job safety of employees.

We evaluate the association's proposal according to that standard. The association contends that, because the proposal "specifically references training approved by the state agency charged with conducting public safety training" it is apparent, from its face, that the proposal directly addresses a matter of on-the-job safety.[24] In other words, the association's basic premise is that, simply due to the *nature* of DPPST—whose function is to, among other things, provide standards, certification, accreditation, and training for public safety personnel, *see generally* ORS 181.610 to 181.714—the association's proposal that at least 20 of the 40 hours of proposed annual training be "DPSST-approved training" is necessarily identifiable, on its face, as presenting a safety issue.

---

[23] There also is nothing in the context of the board's prior case law to support that additional requirement.

[24] The association also suggests that training, in and of itself, is always a "safety issue" for purposes of ORS 243.650(7)(f); we reject that contention without further comment.

We disagree. Even assuming there is a principle that would enable us to look to the evidence in the record to determine the meaning of the term *"DPSST-approved,"* as Gamson reasoned in his dissent, see 257 Or App at 719, that evidence does not support the association's premise that training approved by DPSST is *necessarily* safety training.[25] Rather, that evidence only establishes that DPSST-approved training *could* involve safety, not that it *would* involve safety.[26] As the county points out, not all of the training courses offered by DPSST are safety related; for example, even among the list of DPPST "corrections" courses are topics such as "Sex Offender Registration," "Correctional Law," "Legal Issues in Jails & Prisons," and "Methods of Enhancing Jail Revenue." Thus, the generic reference to "DPSST-approved training," at most, indicates the *possibility* that some training required by the proposal would involve safety training. And that runs afoul of the legislature's intention—discussed above, 257 Or App at 731-32—that employers not be required to bargain over issues that have the potential to affect safety. In other words, accepting the association's reasoning would expand the scope of "safety issues" subject to mandatory bargaining beyond what the legislature expressly intended to permit under ORS 243.650(7)(f). In short, we conclude that the association's training proposal cannot, on its face, reasonably be understood to directly address a matter related to the on-the-job safety of corrections employees. Given that conclusion, we, like the board, do not reach the second part of the statutory inquiry—*viz.*, whether the proposal has "an impact on the on-the-job safety of employees."

In a final assignment of error, the association argues, in the alternative, that, even if bargaining the proposal is not *per se* mandatory under ORS 243.650(7)(f), it is

---

[25] Moreover, the association ignores the fact that the "DPSST-approved training" encompasses only half of the proposed training hours in any event.

[26] In that regard, we reject the association's contention, in its fourth assignment of error, that the board's finding that DPSST provides a "wide variety of safety and non-safety related training" is not supported by substantial evidence. The association's challenge to another of the board's findings—that "county corrections officers do not need an *additional* 40 hours of training to do their jobs competently and safely" (emphasis added)—is simply inconsequential in light of our analysis; therefore we reject the association's fourth assignment of error in its entirety.

nonetheless mandatory under ORS 243.650(7)(a) and (c)."[27] As we understand that argument, the association contends that the proposal, even if it does not present a safety issue, is nonetheless mandatory for bargaining as an "other condition of employment" under ORS 243.650(7)(a), because, under the balancing test established in ORS 243.650(7)(c), the effect of the proposal on employees' conditions of employment (referring to risk and increased overtime) is greater than "the theoretical limitation on [management's prerogative for] assignment caused by reduced dollars." What the association fails to acknowledge, let alone address, either in its opening brief or its reply brief, is that the board—after concluding that the proposal was not *per se* mandatory under ORS 243.650(7)(f)—concluded that the proposal concerned "assignment of duties," which is *expressly excluded* from the definition of "employment relations" under ORS 243.650(7)(g)[28] and thus not subject to the balancing test in ORS 243.650(7)(c) at all.[29] *See Assn. of Oregon Corrections Emp.*, 353 Or at 176 ("matters that are included within, and not excluded by, the definition of 'employment relations'" are mandatory subjects of bargaining). Because the board's conclusion in that regard is

---

[27] ORS 243.650(7)(a) provides:

"'Employment relations' includes, but is not limited to, matters concerning direct or indirect monetary benefits, hours, vacations, sick leave, grievance procedures and *other conditions of employment.*"

(Emphasis added.)

ORS 243.650(7)(c) provides:

"After June 6, 1995, 'employment relations' does not include subjects that the Employment Relations Board determines to have a greater impact on management's prerogative than on employee wages, hours, or other terms and conditions of employment."

[28] ORS 243.650(7)(g) provides that, among other things, "assignment of duties" is excluded from the definition of "employment relations." That provision is quoted in full at 257 Or App 722.

[29] The board explained:

"Although the proposal apparently allows the County to choose and schedule the training employees will receive, the proposal requires that the County remove bargaining unit members from their regular duties and assign them to another duty—training—for 40 hours per year. Accordingly, the proposal concerns assignment because it dictates the type of work management can require employees to perform."

(Citation omitted.)

unchallenged, we reject the association's final assignment of error without further discussion.

In summary, we conclude that the association's proposal that sworn corrections employees "shall receive a minimum of forty (40) hours of approved training per year, of which at least twenty (20) hours shall be DPSST-approved training" was not a "safety issue" subject to mandatory bargaining under ORS 243.650(7)(f). Further, we reject the association's argument that bargaining over the proposal was mandatory by application of ORS 243.650(7)(a) and (c). Thus, we agree with the board that the county did not violate its duty to bargain in good faith when it refused to bargain over the proposal and the association did violate its good-faith bargaining duty by submitting that proposal as part of its final offer of settlement. Accordingly, we affirm.

Affirmed.